UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-62270-RAR

**AZURE COLLEGE, INC.**,

    Plaintiff,

v.

**BANK OF AMERICA, N.A.**,

    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon Defendant Bank of America, N.A.'s Motion for Summary Judgment Against Plaintiff [ECF No. 83] ("Defendant's Motion") and Plaintiff Azure College, Inc.'s Motion for Summary Judgment [ECF No. 84] ("Plaintiff's Motion").[1] Having considered Defendant's Motion, Plaintiff's Motion, and the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion [ECF No. 83] is **GRANTED** and Plaintiff's Motion [ECF No. 84] is **DENIED** for the reasons stated herein.

## BACKGROUND

This case centers around a series of unauthorized Automated Clearing House ("ACH") transactions. The following facts are undisputed. Plaintiff Azure College, Inc. ("Azure") is an institute of higher learning centered in Fort Lauderdale, Florida that opened an account with

---

[1] The Motions have been fully briefed and considered. Plaintiff filed a Response in Opposition to Bank of America, N.A's Motion for Summary Judgment [ECF No. 89] ("Plaintiff's Response") and a Reply to Bank of America, N.A.'s Response to Plaintiff's Motion for Summary Judgment [ECF No. 95] ("Plaintiff's Reply"). Similarly, Defendant filed a Response in Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 91] ("Defendant's Response") and a Reply in Further Support of its Motion for Summary Judgment [ECF No. 99] ("Defendant's Reply").

Defendant Bank of America, N.A. ("Bank of America") in January 2015. Def.'s Statement of Undisputed Material Facts [ECF No. 83], Pl.'s Resp. to Bank of America, N.A.'s Statement of Facts in Support of Motion for Summ. J. [ECF No. 88] (collectively, "Def.'s SOUF") ¶¶ 1, 3. Mr. Jhonson Napolean, the President of Azure, is the only authorized signer on the account. *Id.* ¶ 4.

From November 9, 2020 to November 18, 2020, six ACH debits were initiated by Third-Party Defendant Pistus HHC, LLC ("Pistus"), a company offering "payroll, staffing, and human resources services." *Id.* ¶¶ 12–13. Pistus was contacted by someone impersonating Mr. Napolean who claimed they were interested in engaging Pistus to conduct payroll on behalf of Azure. *See id.* ¶¶ 14–15. The imposter then provided Pistus, or Pistus's agent, with Plaintiff's bank account and routing number. *See id.* ¶ 15. Pistus or its agent transmitted these to Valley National Bank ("Valley National"), and Valley National then effectuated the six ACH debits against Plaintiff's account with Defendant. *Id.* These six transactions totaled $259,800, and Bank of America paid the amount of the transactions out of Azure's account. *Id.* ¶ 16.

The parties do not dispute that these debits were not authorized by Plaintiff. Pl.'s Statement of Material Facts in Support of Summ. J. [ECF No. 84–1], Def., Bank of America, N.A.'s Resp. to Pl.'s Statement of Material Facts in Opposition to Pl.'s Mot. for Summ. J. [ECF No. 92] (collectively, "Pl.'s SOFM") ¶ 4. Plaintiff discovered the unauthorized transactions on November 20, 2022 and reported them to Defendant the same day. *Id.* ¶ 28. Defendant subsequently issued a recredit back to Plaintiff's account for one of these transactions for $29,900. Def.'s SOUF ¶ 17. This was possible because, as shown by unrebutted evidence, one transaction, which was reimbursed, was coded as a "PPD" (consumer) transaction and the remaining five were coded as "CCD" (corporate) transactions. Decl. of Mary Lee Treveno in Support of Bank of America, N.A.'s Mot. for Summ. J. [ECF No. 83–2] ¶¶ 11–12.

Plaintiff's account with Defendant is a business account. *See id.* ¶ 4. Defendant has not credited Plaintiff for the other five transactions. *Id.* Plaintiff's account, and the parties' respective rights and obligations, is governed by a Deposit Agreement and Disclosures ("Deposit Agreement"), the terms of which are not disputed. *See id.* ¶ 5.

Plaintiff filed the operative Complaint on December 16, 2021. First Am. Compl. [ECF No. 39]. After granting Defendant's Motion to Dismiss, [ECF No. 43], a single cause of action now remains for breach of contract due to Defendant's refusal to recredit Plaintiff for the remaining five transfers. *See* Order Granting Def.'s Mot. to Dismiss [ECF No. 56]. On June 14, 2022, Plaintiff and Defendant filed cross motions for summary judgment. Def.'s Mot. [ECF No. 83], Pl.'s Mot. [ECF No. 84].[2] Plaintiff advances two principal arguments in its Motion: (1) Defendant is liable under section 670.204 of the Florida Statutes and (2) Defendant is liable for breach of contract by not accepting liability for the five transactions Defendant did not recredit to Plaintiff per Plaintiff's interpretation of the Deposit Agreement. *See* [ECF No. 84] at 5–10. Defendant principally argues in its Motion that, under Defendant's interpretation of the Deposit Agreement, Plaintiff did not report the unauthorized transactions in a timely manner, and if the Court were to hold that Defendant breached the contract, Plaintiff has failed to mitigate damages. *See* [ECF No. 83] at 7–14.

## **LEGAL STANDARD**

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is

---

[2] On the same day, Third-Party Defendant filed a motion for summary judgment against Defendant. Pistus HHC, LLC's Mot. for Summ. J. and Incorporated Mem. of Law [ECF No. 86] ("Third-Party Defendant's Motion"). Defendant later moved to strike this motion. Bank of America's Mot. to Strike Third-Party Def.'s Mot. for Summ. J., Proposed Findings of Fact and Conclusions of Law, and for Related Relief [ECF No. 106] ("Defendant's Motion to Strike"). As discussed below, because the Court grants summary judgment in favor of Defendant, the Court need not reach the merits of either motion.

entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable factfinder to find for the non-moving party. *See id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), the moving party bears the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

If there are any factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). Furthermore, when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (citation omitted).

## ANALYSIS

### I. Fla. Stat. § 670.204 is Not Applicable to ACH Debit Transactions

Through section 670.204 of the Florida Statutes and its related provisions, Florida "adopted portions of the Uniform Commercial Code to 'predict risk with certainty, to insure risk with certainty, to adjust operational and security procedures, and to price funds transfer services appropriately.'" *Rodriguez v. Branch Banking & Tr. Co.*, — F.4th —, 2022 WL 3692843, at *4 (11th Cir. Aug. 26, 2022) (quoting *Corfan Banco Asuncion Paraguay v. Ocean Bank*, 715 So. 2d 967, 970 (Fla. 3d DCA 1998)). Section 670.204 provides, in pertinent part, as follows:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is not authorized and not effective as the order of the customer under s. 670.202 or is not enforceable, in whole or in part, against the customer under s. 670.203, the bank

> shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

Fla. Stat. § 670.204(1) (2022).  However, the statute provides banks with a method of avoiding this repayment:  Where the bank and its customer agree payment orders will be verified via a security procedure, the bank does not have to refund payment if it accepted the payment order in good faith and the security procedure was "commercially reasonable."  *Id.* § 670.202(2).

For purposes of the statute, a "sender" is "the person giving the instruction to the receiving bank."  *Id.* § 670.103(1)(e).  A "payment order" is defined as:

> [A]n instruction of *a sender* to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
>
> 1. The instruction does not state a condition to payment to the beneficiary other than time of payment;
>
> 2. *The receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender*; and
>
> 3. The instruction is transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system, or communication system for transmittal to the receiving bank.

*Id.* § 670.103(c) (emphasis added).  The parties primarily argue whether Defendant has a "security procedure," and if so, whether it meets the commercial reasonableness requirement of the statute. *See* [ECF No. 84] at 6; [ECF No. 91] at 10–14.  However, both parties appear to have misapplied the statute, as section 670.204 is simply inapplicable to the transactions at issue.

The plain language of the statute defines a "payment order" as a transaction where the "receiving bank is to be reimbursed *by debiting an account of, or otherwise receiving payment from, the sender*."  Fla. Stat. § 670.103(c)(2) (emphasis added).  Here, the "sender" of the relevant instruction was either Valley National or Pistus, as it is undisputed that Plaintiff played no part in initiating the transactions.  *See* Def.'s SOUF ¶¶ 12–15.  The transactions, then, were not "payment

order[s]" under the statute because the receiving bank, Defendant, was reimbursed by debiting Plaintiff's account rather than the account of the sender.

This result, already clear from the text of the statute, is confirmed by a comment to the Uniform Commercial Code Article 4A provision that the relevant Florida statutes adopt, which unambiguously states that "debit transfers" are not governed by the statute:

> In a credit transfer the instruction to pay is given by the person making payment. In a debit transfer the instruction to pay is given by the person receiving payment. *The purpose of subparagraph (ii) of subsection (a)(1) of Section 4A-103 is to include credit transfers in Article 4A and to exclude debit transfers.*

Fla. Stat. § 670.104 cmt.4 (emphasis added). Subparagraph (ii) of subsection (a)(1) is the provision that states the "receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender." U.C.C. § 4A-103(a)(1)(ii) (Am. L. Inst. & Unif. L. Comm'n 1977).

Other courts, both within and outside Florida, have recognized that statutes adopting Article 4A do not apply to debit transactions. *See, e.g.*, *Keppler v. RBS Citizens N.A.*, No. 12–10768–FDS, 2014 WL 2892352, at *9 n.11 (D. Mass. June 24, 2014) ("[T]he deposits in this case were not credit transfers, but debit transfers. . . . Accordingly, they do not appear to implicate the commercial reasonableness standard of Article 4A because they were not 'payment orders' as defined by the statute."); *Experts, LLC v. JPMorgan Chase & Co.*, No. 13–cv–12550, 2013 WL 4487508, at *6 (E.D. Mich. Aug. 20, 2013) (dismissing a claim under Michigan's implementation of Article 4A because "the statute does not apply to debit transfers"); *Goldsmith v. Regions Bank*, No. 08-20100, 2008 WL 11332095, at *4 (S.D. Fla. Apr. 23, 2008) ("[Plaintiff] alleges the transactions were ACH debit transactions, and thus he does not state an alternative claim under Article 4A of the Florida UCC." (footnote omitted)).

While at least one court in Florida appears to have held that Article 4A applies to ACH debits, much of that court's analysis focused on the nature of the account at issue rather than the

specific nature of the transactions before this Court. *See Indus. Park Dev. Corp. v. Am. Express Bank, FSB*, No. 6:12–cv–621–Orl–36GJK, 2013 WL 406815, at *2 (M.D. Fla. Feb. 1, 2013). The Court need not decide whether the account at issue here is an "account" for purposes of the statute, but to the extent the *Industrial Park* court held that an ACH debit always falls within the meaning of "payment order," this Court notes that this result appears contrary to the statute and its accompanying commentary.

Ultimately, the parties do not dispute the transactions at issue were debits, *see* Def.'s SOUF ¶ 12, and thus the statute is inapplicable. Accordingly, Plaintiff is not entitled to relief under section 670.204, and the Court does not reach the parties' security procedure and commercial reasonableness arguments.

## II. Breach of the Agreement

To establish a claim for breach of contract, a plaintiff must prove "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). "Contract interpretation principles under Florida law require [courts] to look first at the words used on the face of the contract to determine whether that contract is ambiguous. It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir. 1999) (internal citations omitted).

"[W]here a contract is facially complete and contains no ambiguous terms, Florida law requires those contracts be enforced in accordance with their terms." *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 991 (11th Cir. 2012). And "[w]hen a contract contains apparently conflicting clauses, we must interpret it in a manner that would reconcile the conflicting clauses,

if possible." *Southern-Owners Ins. Co. v. Hayden*, 413 F. App'x 187, 189 (11th Cir. 2011) (citing *Lloyds Underwriters v. Netterstrom*, 17 So. 3d 732, 735 (Fla. 1st DCA 2009)). The parties do not dispute that a contract exists between them and, while they dispute the amount Plaintiff may recover from Defendant, they do not disagree about the amount of damages Plaintiff suffered in total. *See* Def.'s SOUF ¶¶ 5, 12. It is undisputed that the Deposit Agreement is governed by Florida law. The Court begins by addressing the incorporation of the NACHA Rules into the parties' Deposit Agreement as well as their applicability to the transactions at issue.

### A. NACHA Rules Are Incorporated by Reference and Apply to the Transactions

A contract incorporates another document by reference if the contract "(1) specifically provides that it is subject to the incorporated collateral document and (2) the collateral document to be incorporated" is "sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained." *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1033 (11th Cir. 2017) (quoting *BGT Grp. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011)). The first requirement "mandates that 'there must be some expression in the incorporating document of an intention to be bound by the collateral document.'" *Id.* (quoting *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993)). On the second requirement, the Eleventh Circuit has stated "[i]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Id.* (quoting *Kantner*, 624 So. 2d at 781). However, there are no "magic words" that the parties must use—"[i]t is sufficient if the general language of the incorporating clause reveals an intent to be bound by the terms of the collateral document." *Vidco Indus., Inc. v. Viracon, Inc.*, Nos. 04-21260, 05-21948, 2007 WL 9700705, at *3 (S.D. Fla. Feb. 6, 2007) (quoting *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 51 (Fla. 1st DCA 2005)).

First, some background on the ACH system and the NACHA Operating Rules & Guidelines[3] is warranted.  The ACH network is a "batch processing system" that allows financial institutions to "accumulate ACH transactions and sort them by destination for transmission during a predetermined time period."  NACHA Operating Rules & Guidelines OG1 (NACHA 2020 ed.).  This network is governed by a set of rules known as the "NACHA Operating Rules," the implementation of which is aided by the "NACHA Operating Guidelines."  *Id.* at Introduction.  They are collectively published by NACHA, also known as the National Automated Clearing House Association.  NACHA Operating Rules § 8.59.

The Deposit Agreement, in a section regarding "ACH Debits and Credits," states that, "For each ACH transaction, you agree that the transaction is subject to the National Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect."  Deposit Agreement [ECF No. 84–2] at 45.  This provision clearly incorporates the NACHA Rules by reference.  Starting with the second requirement, the express reference to "the National Automated Clearing House Association (NACHA) Operating Rules" "sufficiently describes" the NACHA Rules such that the intention of the parties to be bound by them is clear.  Turning to the first requirement, while the Deposit Agreement does not use "magic words" to indicate it is entirely "subject to" the NACHA Rules, this plain language clearly shows an "intention to be bound" by the NACHA Rules in the context of ACH transactions.  *Global Quest*, 849 F.3d at 1033.

Recognizing that the NACHA Rules are incorporated by reference, the Court turns to the heart of the parties' dispute: the purportedly conflicting portions of the Deposit Agreement.

---

[3]  While the parties attached versions and excerpts of the NACHA Rules and Guidelines to their submissions, *see* [ECF Nos. 82–2, 84–9, 85–4, 85–6], to apprise itself of the framework applicable at the time of the transactions, the Court requested that the parties provide it with a copy of the 2020 NACHA Rules and Guidelines.  *See* [ECF No. 119].  The Court specifically requested, and cites, the 2020 version of the Rules because they were the rules in effect at the time of the transactions.

Plaintiff relies on a portion of the "Reporting Problems" section of the Deposit Agreement, which states:

> If you find that your records and ours disagree, if you suspect any problem or unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement . . . .
>
> . . . If we have a specific agreement with you for a service or this Agreement has specific provisions for a service (such as the *Funds Transfer Services* section), these provisions supplement the specific agreement and provisions to the extent they are not inconsistent.
>
> . . . .
>
> Except as otherwise expressly provided elsewhere in this agreement, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:
>
> - you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and
>
> - you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

[ECF No. 84–2] at 28-29 (emphasis in original).[4]  The same portion of the Deposit Agreement also provides that, "You agree . . . that 60 days after we send a statement and any accompanying items (or otherwise make them available) is the maximum reasonable amount of time for you to review your statement or items and report any problem or unauthorized transaction . . . ." *Id.* at 28–29.

---

[4] The Court also notes that, as addressed in Defendant's Response, [ECF No. 91] at 6–7, Plaintiff's First Amended Complaint referred to a different portion of the Deposit Agreement. [ECF No. 39] ¶¶ 18–19. This provision, according to Plaintiff, made Defendant liable for unauthorized transfers reported within fourteen (14) days "of the first notice or statement on which the errant funds transfer appears." [ECF No. 39] ¶ 18.  Plaintiff appears to have abandoned this argument, potentially because, as referenced in Defendant's Response, [ECF No. 91] at 6–7, this statement appears in a section of the Deposit Agreement qualified with the following: "This *Sending Funds Transfers* section applies to wire transfers and transfers we make between Bank of America accounts.  It does not apply to automated clearing house (ACH) systems funds transfer services." [ECF No. 84–2] at 44 (emphasis original).

Defendant, in turn, argues that Plaintiff's reliance on the "Reporting Problems" section is misplaced because the "ACH Debits and Credits" section of the Deposit Agreement requires that ACH transactions be "subject to" the NACHA Rules.

Ordinarily, when confronted with conflicting provisions the Court "must interpret [the contract] in a manner that would reconcile the conflicting clauses[.]" *Southern-Owners Ins. Co.*, 413 F. App'x at 189.  However, there is nothing to reconcile in the Deposit Agreement.  As noted above, the "Reporting Problems" section relied upon by Plaintiff contains the following provision: "If we have a specific agreement with you for a service or this Agreement has specific provisions for a service (such as the *Funds Transfer Services* section), these provisions supplement the specific agreement and provisions to the extent they are not inconsistent." [ECF No. 84–2] at 28 (emphasis in original).  Significantly, the "Funds Transfer Services section" houses the provision relating to "ACH Debits and Credits" cited by Defendant and addressed by the Court above.  *Id.* at 45.

This provision's plain and unambiguous meaning provides that the section on "ACH Debits and Credits" that incorporates the NACHA Rules by reference controls any dispute related to an ACH transaction to the extent the framework provided by those rules is inconsistent with the provisions cited by Plaintiff in the Deposit Agreement.  It follows that the NACHA Rules incorporated by that section control as well.

### B. The NACHA Rules Do Not Require Defendant to Recredit Plaintiff

There are five parties principally involved in every ACH transaction: (1) Originator; (2) Originating Depository Financial Institution ("ODFI"); (3) ACH Operator; (4) Receiving Depository Financial Institution ("RDFI"); and (5) Receiver.  *See* NACHA Operating Guidelines OG 1.  All but the ACH Operator are relevant to this dispute.

The "Originator" is the "Person that has authorized an ODFI . . . to Transmit . . . [entries] to the Receiver's account at the RDFI." NACHA Operating Rules § 8.68. An ODFI is "a Participating Depository Financial Institution with respect to Entries (a) it Transmits directly or indirectly to an ACH Operator for Transmittal to an RDFI, and (b) on which it is designated as the ODFI in accordance with Appendix Three." *Id.* § 8.66. An RDFI is the "Participating Depository Financial Institution with respect to Entries (a) it receives from its ACH Operator to the accounts of Receivers, and (b) on which it is designated as the RDFI in accordance with Appendix Three (ACH Record Format Specifications)." *Id.* § 8.83. Finally, a Receiver is "a Person that has authorized an Originator to initiate a credit Entry, debit Entry, or Non-Monetary Entry to the Receiver's account at the RDFI." *Id.* § 8.81. And "[w]ith respect to debit Entries, the term 'Receiver' means all Persons whose signatures are required to withdraw funds from an account for the purposes of the warranty provisions of Subsection 2.4.1 (General ODFI Warranties)." *Id.* With respect to the transactions here, Pistus was the Originator; Valley National was the ODFI; Defendant was the RDFI; and Plaintiff was the Receiver.

An "Entry" can take the form of a credit Entry, debit Entry, or Non-Monetary Entry. *Id.* § 8.37. A "debit Entry" is "an order or request for the withdrawal of money from the deposit account of a Receiver, or general ledger account of an RDFI." *Id.* § 8.37(b). Also relevant is a "Return Entry," (also called a "Return") which is a "credit or debit Entry initiated by an RDFI or ACH Operator, that returns a previously originated credit or debit Entry to the ODFI within the time frames established by these Rules." *Id.* § 8.92. The transactions at issue here, in which Valley National used the ACH system to request withdrawals of money from Plaintiff's account, fit squarely into the definition of a "debit Entry," and were Bank of America to send a request to Valley National to send the funds back to Bank of America, this would be a "Return Entry." *See*

U.C.C. § 4A-104 cmt. 4 ("In a debit transfer the instruction to pay is given by the person receiving payment.").

### i. Under NACHA Rules, Defendant Could Not Automatically Return the Unauthorized Entries

With the terminology established, the Court now lays out the relevant rules relating to return of the ACH debit entries at issue, which make clear that Defendant was under no obligation to recredit Plaintiff.

As a general matter, "[a]n RDFI may return an Entry for any reason, except as otherwise provided for in Subsection 3.8.1 . . . . An RDFI must comply with the requirements of Appendix Four (Return Entries) for each Return Entry it initiates." *Id.* § 3.8. The same rule provides that "[a]n RDFI must Transmit a Return Entry to its ACH Operator by the ACH Operator's deposit deadline for the Return Entry to be made available to the ODFI *no later than the opening of business on the second Banking Day following the Settlement Date of the original Entry*." *Id.* (emphasis added). Relevant to business accounts, the NACHA Operating Guidelines similarly provide that:

> Unauthorized, ineligible, or improper debit entries to business accounts may be returned by the RDFI in one of three ways. The RDFI may return any unauthorized debit as Return Reason Code R29 (Corporate Customer Advises Not Authorized). *Returns bearing the R29 Return Reason Code must be received by the RDFI's ACH Operator by its deposit deadline for the return entry to be made available to the ODFI no later than the opening of business on the second banking day following the Settlement Date of the original entry.* If an RDFI receives written notification from a Receiver after the time for return has expired that a CCD or CTX debit Entry to the Receiver's account was not authorized by the Receiver, *the RDFI may transmit a permissible return entry to the ODFI, provided that the ODFI has agreed, either verbally or in writing, to accept the late return entry.*

NACHA Operating Guidelines OG106 (emphasis added). Rounding out the sources that confirm this timeline, Appendix Four of the Operating Rules provides a Table of Return Reason Codes

along with the timeframe they must be sent by. R29, the code for automatic return of an Entry relating to a corporate customer referenced above, has a "Time Frame" of "2 Banking Days." NACHA Operating Rules, app. Four.

On the other hand, the NACHA Rules are more permissive of Returns related to consumer accounts. The two-day timeframe established for Return Entries is subject to certain exceptions, including those governed by section 3.13 of the NACHA Rules. *Id.* § 3.8. That section in turn provides that an RDFI may send an "Extended Return Entry with respect to any debit Entry for which it recredits a Receiver's account in accordance with Section 3.11" provided that the RDFI made "no error . . . in the debiting of the original Entry to the Receiver's account, except with respect to a stop payment order" and the RDFI transmits the Extended Return Entry "no later than the opening of business on the Banking Day following the sixtieth calendar day following the Settlement Date of the original Entry." *Id.* § 3.13.1.

Following this series of internal references, section 3.11 governs when an RDFI has an "[o]bligation" to recredit the account of a Receiver. *Id.* § 3.11. That provision provides that an RDFI "must recredit the accountholder" in certain instances, mostly applicable to consumer accounts. *Id.* An RDFI must "promptly recredit the amount of a debit Entry to a Consumer Account" after receiving sufficient notice from the Receiver of a transaction's unauthorized nature so long as notice was "received in time and in a manner that reasonably allows the RDFI to meet the deadline for Transmitting an Extended Return Entry . . . ." *Id.* § 3.11.1. Relevant to non-consumer accounts, a recredit is required in the case of certain unauthorized "IAT debit[s]," "ARC, BOC, or POP Entr[ies]," or "an improperly-originated RCK Entry." *Id.* §§ 3.11–3.11.2.3. There is no provision for recredit relating to CCD transactions. *See generally id.* § 3.11.

As part of the parties' agreement, the unambiguous terms of the NACHA Rules must be enforced. And the unambiguous terms of these provisions make clear that, at the time Defendant

received notice from Plaintiff that the CCD debits were unauthorized, Defendant could not transmit a mandatory Return for any of them. It is undisputed that the final unauthorized transaction occurred on November 18, 2020, and Mr. Napolean informed Defendant of the unauthorized nature of the transactions in writing on November 20, 2020, the second day after the date of the final transaction. Def.'s SOUF ¶¶ 12, 16. Because of this, Defendant could not communicate the Return Entry by the ***opening of business*** on the second day, as required by the NACHA Rules.[5] And none of the exceptions provided by sections 3.11 and 3.13 appear to apply to the corporate transactions here, as they reference transaction types other than CCD.

Defendant, recognizing this, attempted to permissibly request that Valley National return the entry, which appears to have been to no avail. *See* [ECF No. 83–6] at BANA000287. Notably, the one transaction which was coded as a consumer entry appears to fall within the recredit provisions, and Defendant "promptly" recredited Plaintiff for this transaction. Thus, Bank of America could not recover the amount of the transactions from Valley National under the NACHA Rules because it would not be recrediting Plaintiff in accordance with section 3.11. Remaining for the Court's consideration is whether, notwithstanding that fact, Bank of America nonetheless had an obligation to recredit Plaintiff for the transactions.

### ii. NACHA Rules Do Not Require Defendant to Recredit Plaintiff

Plaintiff maintains that although Defendant could not issue the Return Entry to Valley National, the Deposit Agreement requires Defendant to bear the loss and recredit Plaintiff. But for the same reasons Defendant could not issue an Extended Return Entry, it was not obligated to

---

[5] The Court notes that on its face the two-day reporting requirement appears to have been satisfied as to the final transaction because it occurred on November 18, 2020, and Mr. Napolean reported that it was unauthorized on November 20, 2020. However, the two-day deadline required Bank of America to "Transmit a Return Entry . . . no later than the opening of business on the second Banking Day" after the transaction. Thus, when Plaintiff made his report to Bank of America *after* the opening of business on November 20, *see* Tr. Dep. Jhonson Napolean [ECF No. 84-6] 55:9-56:3, the second day after the transaction, the parties were already outside the window for Bank of America to transmit the entry.

recredit Plaintiff under the NACHA provisions. Plaintiff appears correct that a recredit could possibly be owed independently of a right to issue a Return Entry in the context of certain transactions. *See generally* NACHA Operating Rules § 3.11. However, this is not the case with the five transactions at issue.

As discussed, when it comes to business accounts, the rules provide that a recredit is required in the case of certain unauthorized "IAT debit[s]," "ARC, BOC, or POP Entr[ies]," or "an improperly-originated RCK Entry." *Id.* §§ 3.11–3.11.2.3. The NACHA Rules also provide that "[a]n RDFI's obligation to recredit a Receiver under this Section 3.11 is in addition to any other obligation provided under Regulation E . . . or other applicable Legal Requirements." *Id.* § 3.11.3. "Legal Requirements" is a defined term, encompassing "any law, statute, rule, or regulation, or any binding published interpretation of any of the foregoing, issued by any government authority . . . and any judicial, governmental, or administrative order, judgment, decree, or ruling[.]" *Id.* § 8.56.

Because there are "no ambiguous terms" here, Florida law continues to require that these provisions be enforced by their plain meaning. *Solymar Invs., Ltd.*, 672 F.3d at 991. The presence of provisions relating to obligatory recredit of certain corporate transactions—and lack of corresponding recredit requirements relating to CCD transactions—makes clear that Defendant has no obligation to recredit Plaintiff under the NACHA Rules. The rules cited above provide unambiguous obligations for RDFIs like Defendant to recredit corporate accounts that experience unauthorized transactions in limited circumstances; for example, in the context of certain ARC, BOC, or RCK Entries.

However, the evidence cited by Defendant—and uncontested by Plaintiff—is that the five transactions at issue here were coded as CCD entries. *See* [ECF No. 83–6] at BANA000288. Notably, a section of the NACHA Guidelines relating to a Receiver's right to a recredit does not

dedicate much discussion to recredit for non-consumer accounts. NACHA Operating Guidelines OG109. The NACHA Rules & Guidelines provide more protection to consumer accounts—a fact that Defendant appreciated when it recredited Plaintiff for the one transaction that was coded as a consumer transaction. But as it relates to the five transactions here, the NACHA Rules clearly provide a narrow timeframe during which an Entry can be returned, and they do not require Defendant to recredit Plaintiff in the event this timeframe is missed. And while the provision providing for recredit under other "Legal Requirements" might encompass, for example, section 670.204, the Court has already determined that Plaintiff has no remedy under that statute.

Plaintiff cites a few materials to avoid this result—all to no avail. NACHA Operating Rule 7.5, a rule housed in a section on transaction settlement, provides that RDFIs are "accountable for the amount of all debit Entries received that are not returned." Plaintiff does not provide any language or evidence that this provision, which makes no mention of liability, recredit, or Receivers, would provide it a right to a recredit. Plaintiff also cites to an Operating Bulletin published by NACHA that states the NACHA Rules "provide a mechanism for a consumer to dispute the validity of an ACH debit, and then to be properly re-credited. This existing mechanism shifts the financial burden back to the ODFI of the ACH debit[.]" NACHA, ACH Operations Bulletin #1-2014: Questionable ACH Debit Origination: Roles and Responsibility of ODFIs and RDFIs 2 (2014). However, this "Overview" section cited by Plaintiff simply provides background in the relevant bulletin and is about "consumers," which Plaintiff is not under the NACHA Rules. *See id.*; NACHA Operating Rules § 8.21.

The only conclusion that can be reached at the end of this odyssey through the NACHA Rules is that Defendant was under no obligation to recredit Plaintiff. While the portion of the Deposit Agreement cited by Plaintiff provides a "maximum" timeframe of sixty (60) days for an accountholder to report an unauthorized transaction, the Deposit Agreement plainly subjects ACH

transactions to the NACHA Rules, which do not provide for recredit in these circumstances. While not an issue before the Court, it appears that this maximum timeframe mentioned in the Deposit Agreement would still apply to certain transactions; for example, any transaction governed by Regulation E. *See* 12 C.F.R. § 1005.6(b)(3) ("A consumer must report an unauthorized electronic fund transfer that appears on a periodic statement within 60 days of the financial institution's transmittal of the statement to avoid liability for subsequent transfers."). The NACHA Rules already account for this when they provide that a right to a recredit under the rules is "[n]ot [e]xclusive" and explicitly reference Regulation E as providing potential additional rights to a recredit. NACHA Operating Rules § 3.11.3.

In sum, there being no dispute of material fact and the Court having resolved the disputes related to section 670.204 and the terms of the Deposit Agreement in favor of Defendant, Defendant is entitled to entry of summary judgment in its favor.[6]

### III. The Parties' Remaining Motions

Remaining for the Court's consideration in this case are: (1) Third-Party Defendant's Motion and (2) Defendant's Motion to Strike.

Third-Party Defendant's Motion requests the Court enter summary judgment on Defendant's claim for common law indemnity in Pistus's favor. [ECF No. 86] at 4, 16. As Defendant's claim was for indemnity, and the Court has already determined that Defendant is not liable under the Deposit Agreement or section 670.204, this motion is **DENIED AS MOOT**.

Defendant's Motion to Strike asks the Court to strike Third-Party Defendant's Motion, allow Defendant to depose Howard Leasing, and for attorneys' fees and costs incurred in preparing

---

[6] In its brief, Plaintiff suggests that a remedy against Defendant is appropriate in part because Plaintiff would have no recourse against any other person or entity under the NACHA Rules. [ECF No. 84] at 11–12. The Court, however, is not so sure. *See Sec. First Network Bank v. C.A.P.S., Inc.*, No. 01 C 342, 2002 WL 485352 (N.D. Ill. Mar. 29, 2002).

the Defendant's Motion to Strike and its response to Third-Party Defendant's Motion.  *See* [ECF No. 106] at 10.  The Court, having denied Third-Party Defendant's Motion as moot and granted summary judgment in favor of Defendant as to Plaintiff's claim, need not reach these arguments.  Therefore, Defendant's Motion to Strike is **DENIED AS MOOT**.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's claim.  Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion [ECF No. 83] is **GRANTED** and Plaintiff's Motion [ECF No. 84] is **DENIED**.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, final judgment will be entered by separate order.

2. Third-Party Defendant's Motion [ECF No. 86] and Defendant's Motion to Strike [ECF No. 106] are **DENIED AS MOOT**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 16th day of September, 2020.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**